PITTMAN, Judge.
Phillip W. Jackson was injured in a logging accident. At the time of the accident he was employed by Beeker Timber Company to trim limbs from the tops of trees. He was struck just above his right knee by a falling limb and his supervisor immediately transported him to the emergency room at the nearest hospital, where his injured knee was X-rayed and bandaged. Jackson was referred by the emergency room doctor to Dr. Scott Atkins, an orthopedic surgeon, for further evaluation and treatment.
Dr. Atkins performed three successive surgeries to reconstruct Jackson’s right knee. In the first procedure on March 21, 1997, Dr. Atkins performed arthroscopic surgery to the right knee. During the second surgical procedure on April 18, 1997, Dr. Atkins reconstructed the ligaments, using a portion of the Achilles tendon to build up the ligaments and installing hardware for stability in the knee. The third surgery occurred in May 1998.
On August 4, 1997, after Jackson had recovered from the second surgery, Dr. Atkins returned Jackson to light-duty work; he was temporarily restricted from lifting anything heavier than 20 pounds. On January 6, 1998, Dr. Atkins wrote to Jackson’s workers’-compensation carrier and informed the carrier that Jackson had reached maximum medical improvement (“MMI”). Dr. Atkins informed the carrier that he had assigned Jackson a 10% impairment to his body as a whole or a 25% disability to the right lower extremity. Jackson continued working at Beeker Timber Company under permanent lifting re-strietions, including the restriction that he not lift anything weighing over 20 pounds.
In May 1998, Jackson complained to Dr. Atkins that he was experiencing some pain around the hardware that had been surgically inserted in his right knee. On May 10, 1998, Dr. Atkins surgically removed the hardware in Jackson’s right knee. In August 1998, Dr. Atkins noted in his medical records that Jackson demonstrated some fairly dramatic atrophy in his right quadriceps, but Dr. Atkins continued to maintain that Jackson had sustained a 10% impairment to the body as a whole. On May 26,1998, Dr. Atkins returned Jackson to work, this time under a permanent restriction not to lift anything heavier than 40 pounds.[1] On July 20, 1998, Dr. Atkins determined that Jackson had reached MMI. On that date, Dr. Atkins referred Jackson for tests on his right quadriceps before he assigned Jackson an impairment rating. On August 17, 1998, Dr. Atkins assigned Jackson a 10% impairment to the whole person.
Jackson subsequently became unable to work because of peripheral neuropathy.[2] It is undisputed that this disease is rarely trauma-induced. On September 4, 1998, Jackson sued Beeker Timber Company, seeking recovery of benefits under the Workers’ Compensation Act for total permanent disability as a result of the March 17, 1997, injury to his right knee. Following a bench trial during which ore tenus testimony was taken, the trial court entered a judgment awarding Jackson benefits for a total permanent disability. Beeker Timber Company filed a postjudgment motion, which the trial court never ruled *753 on. Beeker Timber Company subsequently appealed.
On appeal, Beeker Timber Company claims that the trial court’s judgment should be reversed because, it says, Jackson did not present substantial evidence that the portion of Jackson’s disability caused by the peripheral neuropathy (poly-neuropathy) was related to the March 17, 1997, injury to his knee. The applicable standard of review in this case is the “substantial evidence” standard set out by our Supreme Court in Ex parte Trinity Indus., Inc., 680 So.2d 262, 268-69 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)):
“We will not reverse the trial court’s finding of fact if that finding is supported by substantial evidence — if that finding is supported by ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ”
See also § 25-5-81(e)(2), Ala.Code 1975.
The trial court based its judgment in part on the following findings:
“John R. Goff, Ph.D., [Jackson’s] psychological expert, testified by deposition that [Jackson] had a full scale IQ of 59, a verbal IQ score of 60, [and] a performance or visuopractie IQ score of 65. These scores fall towards the middle of the mildly retarded range of psychometric intelligence. Dr. Goff testified that [Jackson] was at the second grade level for word recognition and spelling and approximately a third grade level for arithmetic. [Jackson] is functionally illiterate. Dr. Goff testified that ‘The patient’s mental retardation in and of itself represents a moderately severe mental impairment which substantially limits the patient’s vocational options.’ Dr. Goff testified that [Jackson] has difficulty relating to other people and in his ability to understand, remember, and carry out instructions. [Jackson] has difficulty shifting his attention with varied tasks. He has difficulty with any sort of complex verbal concept. He cannot read or write and cannot understand written instructions. These limitations were not disputed or contradicted by any [Beeker Timber Company] expert.
“Dr. Scott Atkins, [Jackson’s] treating physician, testified by deposition that on December 29, 1998, he had assigned [Jackson] a 20 pound lifting restriction and no bending or squatting. These are permanent restrictions. He assigned him an impairment rating of 10 percent of the whole person or 25 percent of the right lower extremity. He further testified that if [Jackson] did not have poly-neuropathy he would have a lifting restriction of 40 pounds.
“Norma Stricklin, [Beeker Timber Company’s] vocational expert and Thomas Christiansen, by deposition, [Jackson’s] vocational expert, both testified that based on [Jackson’s] age, education, work experience, and the limitations of Dr. Atkins and Dr. Goff that [Jackson] would be permanently and totally disabled.”
The evidence in the record indicates that Jackson was a chain-saw operator for Beeker Timber Company and that the saw he operated weighed approximately 35 pounds. Jackson testified that after Dr. Atkins removed the hardware from his knee in the final surgical procedure, he began to suffer pain radiating down his right leg and occasional weakness and numbness in his right leg, to the point that the leg would occasionally collapse under his weight. Jackson stated that Dr. Atkins told him that these symptoms were the result of polyneuropathy and that they were not related to the accident. Jackson *754 testified that he took pain medication for these symptoms. Dr. Atkins also testified in his deposition that solely as a result of the polyneuropathy, he imposed greater lifting restrictions, prohibiting Jackson from lifting anything over 20 pounds. Dr. Atkins made it clear that but for the poly-neuropathy, Jackson would be able to repeatedly lift 40 pounds or more.
Dr. Atkins testified by deposition that polyneuropathy is a disease involving decreased conduction across a group of nerves. Dr. Atkins testified that trauma is rarely a cause of polyneuropathy, and that common causes are alcoholism, diabetes, and certain toxins. Occasionally the disease is simply idiopathic, meaning that there is no known cause. Dr. Atkins testified that he referred Jackson to Dr. James Barnett, a neurologist, to perform nerve conduction velocity studies, and that Dr. Barnett had confirmed the existence of Jackson’s polyneuropathy.
Jackson’s vocational expert, Thomas H. Christiansen, testified in his deposition that he believed Jackson was totally vocationally disabled. However, Christiansen did not relate the March 17, 1997, knee injury to the vocational disability. Many of the factors Christiansen considered in finding Jackson to be totally vocationally disabled were Dr. Atkins’s restrictions against squatting and bending, as well as the 20-pound lifting restriction, which Dr. Atkins testified were necessitated by the polyneuropathy and unrelated to the March 17,1997, knee injury.
Norma Stricklin, the vocational expert for Beeker Timber Company, testified that she believed that Jackson suffered a 14% to 15% vocational disability as a result of his March 17, 1997, knee injury.
The trial court received as an exhibit the deposition of Dr. John R. Goff, a clinical neuropsychologist who had been retained to evaluate Jackson. Dr. Goff testified that Jackson has severe cognitive deficits; as an example he explained that Jackson is unable to recite the entire alphabet. Dr. Goff also testified that Jackson has an IQ of 59, which is in the range that indicates mild retardation. Dr. Goff described Jackson as functionally illiterate and unable to perform simple mathematic calculations. After reviewing Jackson’s tests, Dr. Goff determined Jackson’s arithmetic skills were at about the third-grade level. Dr. Goff concluded in his report, which was exhibited in the record, that Jackson’s mental retardation, in and of itself, substantially limits his vocational options, and that other logging prospects do not appear viable because Jackson is genuinely fearful that his right leg could suddenly collapse under him, causing re-injury.
The undisputed evidence in the record supports the inference that Jackson would still be working at Beeker Timber Company, trimming limbs with the 35-pound chain saw, if he were not suffering from the effects of polyneuropathy, which exhibited itself long after he was injured. This issue is closely analogous to an issue raised in Goodyear Tire & Rubber Co. v. Correll, 736 So.2d 624 (Ala.Civ.App.1999). In Cor-rell, an employee suffered an on-the-job injury, and one year later began experiencing pain caused by a complication occurring from a previously diagnosed congenital defect. The employee presented no evidence that the trauma of the accident induced the complication of the congenital defect. This court held that without substantial evidence connecting the subsequently occurring complication of the congenital defect to the work-related injury, the portion of the disability pertaining to the complication of the congenital defect was not a compensable injury under the Workers’ Compensation Act. Correll, 736 So.2d at 629, citing Erwin v. Harris, 474 So.2d 1125 (Ala.Civ.App.1985).
*755 There is no evidence in the record to establish that the polyneuropathy from which Jackson suffered was related to his March 17, 1997, accident, or that it was related to the removal of the hardware from Jackson’s right knee. On the contrary, both Jackson and Dr. Atkins presented testimony that the polyneuropathy was unrelated to the accident.
Dr. Atkins assigned Jackson a 10% disability to the body as' a whole for the March 17, 1997, accident. The vocational expert, Norma Stricklin, testified that Jackson has a disability to his body as a whole of between 14% and 15% as a result of the March 17, 1997, accident. The trial court clearly considered Dr. Atkins’s additional lifting, bending, and squatting restrictions when it assigned Jackson a permanent total disability rating, and these additional lifting, bending and squatting restrictions are unrelated to the March 17, 1997, accident. Therefore, the trial court’s conclusion is not supported by substantial evidence.
We reverse the judgment of the trial court and remand this case for the trial court to determine, from the evidence in the record, the extent of the disability that Jackson suffered as a result of the March 17,1997, logging injury.
REVERSED AND REMANDED.
YATES, P.J., and CRAWLEY and THOMPSON, JJ., concur.
MURDOCK, J., recuses himself.

. The record is unclear as to how much of the time between May 26, 1998, and July 20, 1998, Jackson actually worked. Dr. Atkins noted in his medical records on July 20, 1998, that Jackson reported to him that his employer did not have any light-duty work available.

. Also known as polyneuropathy, Dr. Atkins described this condition as a disease of multiple nerves distal to the spinal cord.